HENRY MARTIN *vs.* ARTHUR D. CURRAN & another.

Suffolk.    March 22, 1914. — September 9, 1914.

Present: RUGG, C. J., HAMMOND, LORING, SHELDON, & CROSBY, JJ.

*Negligence,* Employer's liability.

In an action by an experienced workman against his employer, the proprietor of an elliptical coal run for loading vessels, for personal injuries sustained while the plaintiff, who was stationed at the scales which had been his place of work for a number of months, having weighed one of the cars filled with coal, was connecting it with the endless chain that moved the cars, by a disconnected car being pushed against him by a third car that was attached to the chain, it appeared that the plaintiff had told the defendant's engineer that the cars were coming in too rapid succession and that the engineer thereupon had reduced the rate of speed of the engine when the defendant's superintendent came into the engine room and said, "I am boss here; run that machine to speed," whereupon the engineer ran the engine at substantially the same rate of speed as before the plaintiff spoke to him, and the accident occurred. *Held,* that the order of the superintendent did not mean that the engine should be run at an unusual rate of speed, but simply meant that it should be run at its usual

rate of speed, thus restoring the successive arrival of the cars at the scales to its normal basis, of which the plaintiff required no notice, and that the order, thus fairly construed, was no evidence of negligence on the part of the defendant.

TORT for personal injuries sustained by the plaintiff on November, 14, 1901, while in the employ of the defendants, who sometimes did business under the name of the Pocahontas Coal Company, at the coal run owned and operated by them at 462 Summer Street in Boston. Writ dated September 19, 1902.

In the Superior Court the case was tried before *Richardson,* J. At the close of the evidence, which is described in the opinion, the judge ruled that the action could not be maintained and ordered a verdict for the defendants. He agreed with the counsel to report the case for determination by this court, upon the stipulation of the parties, that, if the ruling and order were correct, judgment should be entered on the verdict for the defendants; otherwise, that judgment should be entered for the plaintiff in the sum of $4,000.

After the death of *Richardson,* J., the case was reported by *Crosby,* J., under R. L. c. 173, § 108, as amended by St. 1912, c. 317.

The case was submitted on briefs.

*J. H. Baldwin & F. P. Garland,* for the plaintiff.

*W. B. Sprout & F. B. Kendall,* for the defendants.

HAMMOND, J. This is an action of tort to recover for personal injuries sustained by the plaintiff by reason of an accident which occurred on November 14, 1901, while he was working on a coal run owned and operated by the defendants. The run was an elevated trestle structure, elliptical in shape and over three thousand feet in its entire circuit. Upon its top was a "two foot gauge track" over which were run small coal cars weighing when loaded about fifteen hundred pounds each, propelled by means of an endless cable which when in motion ran "north on the east track and south on the west." The cars were run over the scales at the scale house, so called, which was on the east side of the run; and each car was stopped upon the scales for the purpose of being weighed. At the scale house and at various other places around the circuit there were push buttons, by means of which employees could signal the engineer to start or

stop the engine, and thus start or stop the cars. The cars also could be controlled independently of the cable by loosening the grip and applying the brake. In this way any or all of the cars could be stopped while the cable was in motion. Between the scales and the engine house and over the east track were three towers, beside and extending above the trestle work structure, each tower having a hopper and machinery for hoisting coal from a vessel, the hopper being raised and swung over the cars, which were stopped on the track by means of loosening the grip long enough to receive the coal; the grip then being tightened, the car went forward. These towers were movable, and on the night of the accident the one nearest the scales was about forty feet distant from them. Upon the rear end of each car was a platform through which extended the grip mechanism by which the cars were "made fast to or loose of the endless cable." Each car was furnished with a brake. The cars could be stopped under the towers for loading or on the scales for being weighed or for any other purpose by loosening the grip and putting on the brake, which generally was done by a man on foot following the car. When one car was stopped on the scales for the purpose of weighing, the car immediately behind would be approaching the one stopped; after the first car was weighed and had started along, the second car coming upon the scales would in turn be stopped for weighing and the first car would regain its distance, while the third car would be approaching nearer the second, and so on. The same process would take place when the cars were stopped under either of the towers for loading. Somewhere along that portion of the track, where the double cable ran, it was necessary to stop the car for the purpose of changing the grip from one cable to the other. The plaintiff was injured by being caught between two cars.

At the time of the accident the plaintiff was stationed at the scales, and his duty was to ungrip the car, stopping it by the brake if necessary, so that it could be weighed, and when he received the signal that it had been weighed, then to take off the brake and start the car by the grip. He had been doing this work for several months. A fellow servant named Garo was at work near him, regulating the speed of the cars as they approached the scale house to be received by the plaintiff.

The plaintiff testified that when he went to work at seven o'clock on the evening of the accident, "the cars came very fast, and he had all he could do to handle them, and he thought if he stayed there without notifying the engineer he would get hurt, and he found them coming so fast he couldn't handle them; that he had one car on the scales and gripped it and started it going; that then he pressed the button near the scale-house, which connects into the engine-room," and "spoke to the engineer." He further testified that for a little more than half an hour the cars seemed to come "at a moderate rate of speed, and he kept on gripping the cars as they came."

As to the manner of his accident, he testified on his direct examination as follows: "Then [at the end of the 'little more than half an hour' above named] he noticed two cars coming very close together, . . . he would say about four feet apart, and Garo following one car up, the last car, and he, the plaintiff, went up and handled the first car, threw off the grip, put the brake on and stopped it on the scales about the same time Garo stopped his car behind him (the plaintiff), and he just waited long enough to turn around to see if Garo was still standing there, and he put his leg in to grip, and just had the wire out, the other one in, and a jar threw his head back and the other car coming behind him came against him and hit him down his left knee and leg; that when the car struck him he kept on to the grip, and the car ahead of him dragged him about six feet, he would say, then he let go and rolled off; that at that time the grip was on, but he was pretty sure it wasn't tightened, and it was the bumping of the other car that caused him to be dragged."

On cross-examination he testified that just before the accident he "saw the two cars coming very close together, one of which was the car that hit him; that the car that hit him, the first one after the one that he stopped, was about nine feet away from him and fifteen feet from the scales; that he knew that these two cars were being propelled by the cable and that the cable was in motion, and that these cars had got to come where he was unless he got out of the way, and that he did not get out of the way; that at the time he was just gripping a car, which was done at the rear end of the car, so that he was standing somewhere between the car that he was gripping and the two cars that he saw

coming toward him." He further testified in substance that there were three cars in the vicinity at the time of the accident, namely, the one he was trying to grip, the one next to it which had been ungripped by Garo who was standing by it, and a third three or four feet behind the second which was still gripped. Of these three cars the first two were stationary, while the third was still moving toward the other two; that in this state of things he put his leg in between the two stationary cars; that then the second car came up on to him, and he "assumes" that the third car following along, gripped to the cable, struck the second car and pushed it against him. He further testified that he knew there was bound to be a third car coming up very soon, and that when that third car came up it was bound to carry that second car along with it if that third car was not stopped. He further testified that he could operate the grip and brake while standing outside the rail, but "it would be awfully slow the way the cars were coming."

Whether the whole evidence would warrant a finding that the plaintiff was in the exercise of due care is a question of some difficulty; but, in view of the conclusion to which we have come upon the question of the negligence of the defendants, it has become immaterial.

There is no evidence of any defect in the ways, works and machinery. At the time of the accident everything was working smoothly and as it was intended to work. But the plaintiff maintains that the order given to the engineer by Sensibough, the defendants' foreman, was negligent. Upon this part of the case there was evidence which, although slight and somewhat vague, would justify a finding that on the night in question, after the plaintiff had talked with the engineer and before the accident, the superintendent (Sensibough) came into the engine room and finding that at the request of the plaintiff the engine was running at a reduced rate of speed, said, "I am boss here; run that machine to speed," whereupon the engine was run at substantially the same speed as before the plaintiff talked with the engineer.

We do not understand that this order meant that the engine should be run at an unusual speed, but simply that it should be run at its usual speed, the speed at which it was intended to be

run. It cannot be construed to mean that if at any time the actual or relative position of any of the cars was such as to create any dangerous situation the power was taken away from the plaintiff or any other employee to have the cable stopped by signalling by means of the button to the engineer, or if necessary to grip or ungrip any car. It was simply an order for the conduct of the business in the usual way and under the usual conditions. The superintendent had the right to assume that an experienced workman, as the plaintiff then was, would observe the speed of the cars, as he did, and would govern himself accordingly; and that there was no need of giving him notice of the order or further instructions as to what to do or how to act. By this order the business was placed on its normal basis, and such by the fair construction was its intention. It appears further that one less than the usual number of cars was being run on the evening of the accident, and there appears to have been no reason to anticipate any unusual situation. Under these circumstances the order, fairly construed, cannot be regarded as a negligent order. The case differs materially from *Carroll* v. *New York, New Haven, & Hartford Railroad*, 182 Mass. 237; *Baggneski* v. *Lyman Mills*, 193 Mass. 103; *Carroll* v. *Fore River Ship Building Co.* 208 Mass. 296, and similar cases cited by the plaintiff.

*Judgment on the verdict.*